Case 24-1311, Randy Erickson v. Gogebic County, MI et al. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good morning. Good morning, and may it please the Court. Callie Henderson on behalf of Defendant Scott Voigt. May I please reserve three minutes for rebuttal? Yes. Thank you. Now, this case presents two straightforward questions of qualified immunity in the Eighth Amendment context. The first is whether it was clearly established in 2020 that a reasonable corrections officer could take an inmate to the ground without using malicious or sadistic force if he had a good-faith belief that he was taking that individual down to the ground to maintain order and discipline in the facility. The second is whether he violated clearly established law when he did not immediately provide or question whether any medical care was needed when none was asked for. And I think the video in this case undisputedly shows that in both instances, Defendant Voigt is entitled to qualified immunity. If we turn to the first question of excessive force. The video here is kind of intense. You know, you don't see a lot of struggle, a lot of resistance. You see someone kneeling in cuffs, and then they're just taken down. What am I supposed to see in the video that justifies this type of use of force or, you know, eliminates any question of material fact that it's not unnecessary or wanton? Yes, Your Honor. When we back up that video, I think we have to start considering the full context of it back in the cell because I think that sets the parameters for which Voigt is responding to. When we look there, that's when the plaintiff, Mr. Erickson, he's causing a disturbance, very intentionally causing a disturbance. He has to be removed from that cell because he's angry. He's angry that he's lost his visitation time. So he repeatedly beats on the door, kicks the door. He throws a bed at the door so much that he has to be removed so that he doesn't create further disturbance with others. But now he's cuffed. Sorry, Judge Murphy. Oh, I agree. He is cuffed. I think part of the issue is his prior willingness and anger that he had demonstrated. So now he's cuffed, but when he's having to be uncuffed, I think that's really what the defendant is concerned about is that I'm removing the cuffs. I have to make sure that I do this in a manner that's safe and allows me to remain in control. And he gets some resistance there. And, no, it's not going to be, we see in the video, it's not some exuberant show of resistance or violence. And I don't think the force is really, it happens very quickly. He just wants to get him down onto the ground. He doesn't excessively, you know, he's not applying blows, anything of that nature. He just gets him down to the ground so that he can be in a position of control. And, yeah, he does it quickly. And I think this court has always recognized that shows of force aren't always going to be pretty, but they can be necessary. So your opening statement suggested whether it's clearly established that an officer can violate the Eighth Amendment if the officer uses force in good faith in a non-sadistic way. But why isn't that the entire dispute here, whether a jury could find that he had a malicious intent? That's where I think the evidence is lacking from what we know. We know that Voight was just responding to the prior disturbance. We have on the video, the resistance is documented. The resistance that Voight was responding to, that is documented. It's not resistance. He was responding to kind of misconduct, but it wasn't resistance. Like once he took him out of the cell, there was no resistance at all. Well, actually, I think there was resistance, Your Honor. I think when he, the testimony is that he did tell him multiple times that he wanted him to get his knees on the ground, both knees on the ground. And when they get into the cell... So he had one and three quarters, one knee totally on the bed, one knee half on the bed, the foot was still touching the ground. And then when he says, kneel down again, he goes a little farther down. And from that point, a jury couldn't find that it was malicious just to throw him to the ground and kind of push him back and forth with such force that it broke his collarbone? Yes, Your Honor. I do think that at that point, we're at a legal question for the court to decide because we have the video, right? But I think what we've missed is looking at this from the perspective of the corrections officer where he has told this individual exactly what to do. This individual has actually refused. And I think we're kind of glancing over the resistance. Is this great for his safety? Is that part of the problem? The corrections officer, yes. Then why, when he's uncuffed, does he turn his back to him? Your Honor, as I understand it, he gets out of there quickly because he's now uncuffed. So he is just trying to get out of there quickly. So he turns his back to him? Your Honor, I don't have an answer for why he turns his back to him. I think it's just the quickest way out. It's back to the question of whether there's a triable issue of fact on this point. I mean, that seems inconsistent with your theory. That's the kind of thing a jury could consider, right? I don't think it's inconsistent with the theory once they have subdued him and then they've felt that it's okay to take the cuffs off. Let's do a hypothetical. It's not this case. The hypothetical is I've got to do X, Y, and Z because he's a threat to me. As soon as you've done X, Y, and Z, including a dramatic throwdown, you take the cuffs off and you stay in the cell with your back to the guy for another three minutes. A jury would be able to say, well, wait a second. I'm not following this. That's hypothetical. So you're not conceding away your case. But I'm just saying, wouldn't that be something a jury could think about? I don't think in this case that this is something that a jury should be deciding. I got it. My hypothetical. Oh, I understand your hypothetical. Wouldn't that be a legitimate jury question? The guy says, I had to throw him down. I had to do all this force because he was a threat to me. This is a dangerous job. I want to go home tonight and see my family. Having given that explanation, he then takes the cuffs off and puts his back to the guy, stays in the cell. In my hypothetical, I'll make it even worse, ten minutes. Can't a jury say, what are you talking about? What happened to the threat? Why did it disappear so quickly? So in that hypothetical, yes, a jury could think that. I wouldn't disagree that a jury could. But I don't think even in that hypothetical that a jury should be, given the Eighth Amendment standard, that we're not looking to evaluate, was this force reasonable? What we're looking for is... It's a subjective test, which is a test that is generally suited for jury determination. It's not an objective test that is legal. It's a subjective test. What was the state of mind of the defendant when he used this force? And it seems to me a jury could find, when I watched the video and I watched the entire encounter beforehand, that the force was just malicious because he was upset with the guy's disruption earlier. And it had nothing to do with personal safety. Now, you would have your defense, but you have to prove that to a jury. I hear what the court is saying, and I still... That was a good... That was such a good response when you're getting hard questions. Let me just compliment you. Thank you. Well done. I definitely hear what you're saying, and I still... I would point the court back to the deference that we give to the corrections officers in those moments, such that he's articulated also a reason why that force was necessary under the circumstances, because he knew that that foot was remaining up. I'm sorry. I'm demonstrating. It's my tendency. But that foot remained up, and his... Despite the command, the command wasn't followed. Instead, he leaned forward, and he's interpreting that. That's what he's responding to as, okay, this guy isn't going to do what I want. He's trying to maintain in this position, so I've got to get him down into a different position. But then that goal was achieved. He did get him down. Was it that his foot remained up or down? His foot remained up. Okay. And he wanted the foot down on the ground? Yes, because that's where he gets the position of control over Erickson. That's why he wanted both knees down. Both knees down. Is the foot... He wants him off his feet. Yes. Off his feet, so the foot up. Yes, the foot up. If you're trying to get your foot up, couldn't a reasonable jury think, well, I have to lean forward in order to get my foot up in that position? I think... I mean, that's why if we're parsing to this level, these aren't legal questions. These are things that we leave to a jury. Well, I think what you just touched on is that we're parsing things to this level right now with this benefit of hindsight. And I don't believe that the Eighth Amendment permits such parsing, given the situation that Voight was in. He didn't have this luxury to sit here and go back and forth. Did he have to uncuff him? Yes. Why? It's my understanding that he was not going to leave him in that room handcuffed. Did he have to uncuff him in the room? Could he have, like, stuck his hands through the door and had gone out the door and asked him to put his hands through and then uncuffed them that way when he was outside? Your Honor, again, I know that's actually an argument plaintiff advanced in this case, considering many of the different alternatives in that moment. And I think that goes back to the same point, though, that we're kind of Monday morning quarterbacking. But the Monday morning quarterbacking is circumstantial evidence in support of the view that this was not a force that the officer himself thought was necessary and instead was a malicious force just because he was upset with the plaintiff. I would just add, piling on, that the jury trial is always a Monday. Yes. To some extent... It's always afterwards, sorry. I totally recognize that. We never do it before. We never do it during. Yes. Yes, that would be interesting if we could do it during, right? But that's where I also then turn to the clearly established prong, such that what case... I'm going to ask you because your time is going to run short. Yes. So in the Fourth Amendment context, when it's something like probable cause or the objective test, I understand the need for a case directly on point because it's a general standard and it's kind of a totality of the circumstances test. But in this context, I think the Eighth Amendment test is very difficult, and that's helpful for you, but it may actually undermine your clearly established argument because I think at a high level of generality, it can be enough to put officers on notice when the intent standard is so high. So in order to violate the Eighth Amendment, a defendant has to act maliciously. So here, if we think a jury could assume that your client acted maliciously and he just used this force with a state of mind of just, I wanted to beat him up and no real reason, wouldn't any reasonable officer recognize the illegality of that conduct once the jury can conclude that he acted maliciously? I think that's exactly the point, though, of the clearly established because where his conduct, especially here where there's case law that kind of suggests that this would be okay, right? I think, if anything, we're in that gray area. But that's where... I accept the facts. I know you disagree on the facts, but just assume that I think a jury could find that he acted maliciously. To say that it's not clearly established, you'd have to say that no law clearly establishes the notion that he couldn't maliciously throw him to the ground and knee him in the back for no reason, and it's not obvious. I mean, why wouldn't Hudson itself clearly establish that rule that that's illegal? Well, I think it's the other half of that that the jury could also decide, as the lower court recognized, and I recognize my time if I could just complete this, that it's the other half of that equation where they said, yes, we could understand where he did think that this was a reasonable response to that action there, and it fits also within the other case law that we have recognized, and that, I believe, puts it firmly within that gray area, and that's what the gray area is there for. You're making the point you can maliciously do a legitimate thing and still win. Well, that there could be evidence that it could be malicious, but there's also evidence that it wasn't, and the case law suggests that under these circumstances it could also be justified. Therefore, I think that's what that gray area catches because the case law hasn't told him this is all the time going to be malicious. Okay, thank you. You'll get your full rebuttal. We appreciate it.  Okay, Mr. Cabot. Good morning, Your Honor. Sean Cabot on behalf of the Appellee, Randy Erickson. I guess I'm just going to kind of go off my notes for a moment and start addressing some of the issues that the panel has raised, starting with kind of Judge Murphy's inquiries about clearly established, and it's our position that the law was clearly established. I mean, we cited in our briefing the Cordell case, which was a 2014 Sixth Circuit case, which many of the facts in that case mirror the facts in this case. The fact that he was handcuffed when the force was used, he wasn't creating this prison-wide disturbance, which is really what these cases are going after. And so I think in this case, there clearly was a case, at a minimum, a case. And again, it's the 2014 case of Cordell that puts everybody on notice that this type of behavior, this type of force was unconstitutional. And I think that even goes further with the facts of the case, the fact that the incoming sheriff basically said, what you did was wrong. So even to the sheriff, obviously in 2020, the law was such that, clearly established, that even the sheriff said, look, I saw what happened. Based on the law, what you did was wrong. So I think when you have the law and you have the circumstances of the sheriff and his reprimand of Voight's actions, it shows that the law was clearly established. So there's two elements to an Eighth Amendment claim, an objective one and a subjective one. Now I was positing the notion that maybe you don't need a case directly on point to satisfy the subjective one, because the standard of having to act maliciously was enough to put anybody on notice that if they acted maliciously in a specific fact pattern, that would be enough. But you still need an objectively high level of force. Don't you think you would need a case comparable to determine whether this force would match that force? So it's just an objective level. So the court has said not every push and shove, even if malicious, is going to violate the Eighth Amendment. So you think Cordell, is that the case where they rammed the inmate's head into a steel door? Yes, so Cordell was the case where he was handcuffed. Again, there was no evidence that he was resisting, all those things that we would normally look for. None of those were there. The officer rammed him, and I think he got some stitches. In this case, and there's case law that says just because you don't see an obvious external injury does not mean that you don't have an Eighth Amendment claim. In this case, we know that within two days, I mean he immediately that day complains to the health care about pain in his neck, back, shoulder, those things. And then within two days, he goes to the hospital where they find a fractured rib. So again, you have the evidence, even in this case, of a significant injury that supports the fact that there is a malicious and sadistic use of force because you have a fractured rib. Why don't you shift to the deliberate indifference argument? So I believe the magistrate judge in his report and recommendation said that the deliberate indifference to a serious medical need, I believe his words was it was a closer call. However, I think when you look at, again, everything that's happened from beginning to end, it shows that there was deliberate indifference. What were the signals at the beginning that he needed health care? Well, first of all, he does, Defendant Voight doesn't even wait around to see if there was a need for health care. When you watch the video, he basically yanks him, throws him down, does the choke hold, puts his almost 300 pounds of pressure on his neck and back, and then uncoffs him and immediately walks out, never comes back. So again, I think that squarely goes to... It might have been reckless, but I thought the test, he actually has to have actual knowledge of, I suppose it's knowledge of a risk, but actual knowledge of the risk of a health problem or a health concern. And I don't know that just him walking away shows his actual knowledge. Well, the subjective component, you have to have, obviously, the culpable state of mind, and I think the standard is the corrections officer has to subjectively perceive facts from which to infer substantial risk to what happened, and he drew that inference and disregarded that risk. I think when you watch the video, and I think Judge Loomkatz, her description of the video was that it's intense. It is very intense. I mean, you see... And again, I think you have to really go back to the beginning where he's taken out of the cell, Defendant Voight admits, he handcuffs him, no problem. He walks him down the hall, no problem. We don't have any of these things where he stops and slows down. Totally compliant all of the way, and even... Are you in excessive forceland or deliberate indifference? Well, I'm getting there, because I think when you take all these pre-incidents, it shows that he didn't care, and he disregarded all the risks because he just didn't care about the guy in the first place, whether it's because there's an orange peel outside the cell and the three or four guys in the cell don't claim to doing it. But when you see the force that he uses, I mean, he literally yanks him, and we watched the video, throws him down, chokes him, all this stuff. It goes to this point that his actions disregard any potential risk of harm that could happen, and doing those type of actions, and I believe the record says he was 275, 285 pounds. Mr. Erickson, I think, was 160, 170. He outweighs him by over 100 pounds, and this type of action that he took against Mr. Erickson clearly is going to cause injury. Is your argument that when this particular officer, Mr. Voight, or anyone kind of of his size does a takedown maneuver, then they have a responsibility to check on any kind of medical harm that they could have caused, kind of irrespective of whether the inmate is complaining? I mean, I don't think the size of the officer is dispositive. I mean, I think if you had even . . . But I take Judge Blumkatz to be asking, when you do an intense takedown maneuver, maybe there's just . . . is there just an obligation at that point to make sure everything's okay? Because it's an intense maneuver. It's not crazy to think someone could break a bone. Sorry. I thought you were referring more to the weight. I don't know. That's what I took her to be saying. Maybe you would think if the takedown maneuver was done by somebody who's less than 100 pounds, that they're unlikely to break a rib. But Chief Judge Sutton is right. I figure that some of these maneuvers might happen with some regularity, and I'm trying to figure out what the rule is that you might be asking us to write. So, of course, I'm certain that defendant would say, well, I can't stay in the cell and ask him if he's okay, because I've already in my mind determined he's a threat or whatever. But there certainly isn't anything that would have stopped, for example, defendant Voight from exiting, facing the inmate, which is usually what happens when you're afraid of them. You exit while facing them. And getting outside the cell, shutting the door and say, are you okay? Are you saying that every officer who does a takedown maneuver to uncover someone then needs to do that, whether, you know, after the cell doors were closed, so they're in safety, then needs to check, maybe just ask them questions, are you hurt? Or, like, what is the kind of broader implication? Well, there certainly isn't a case that I've seen that says you have to do that. But I think when you go into the Eighth Amendment and you're dealing with the subjective component and you're dealing with the intensity of the takedown that was done in this case, where there really wasn't a need for it, I think it naturally flows that there would be a question, especially when, you know, you have a relatively, you know, skinny and not heavy man where an injury is naturally going to flow from that type of takedown. And we're not talking about, you know, a leg sweep. And I know one of the cases dealt with a leg sweep and there was a, you know, a broken leg. I mean, you know, obviously that's probably not common. But in this case where you're taking down an inmate with the force and intensity that happened in this case, that was really, when you watched the video, absolutely out of the blue. What is the evidence for what? So I know he left the cell. And then I watched the video and your client got up and started walking, kind of pacing back and forth, seemed more angry than injured. But we don't have the audio, so I don't know what he was saying. But is there any evidence about whether the defendant did or did not see him as he just walked away from the cell? My understanding in the record is that there was part in the video, I think you could see Mr. Erickson shaking his wrist. But as far as with respect to Defendant Voight, my understanding from the record is that he didn't do anything. He left the cell and that was it. If he saw him walking, that might itself be an acknowledgement that he seemed okay. There's no evidence in the record that Voight saw that. And, you know, even let's assume for a moment that there was walking away. There's the case law that talks about, you know, these visible, obvious injuries versus something that you don't see. Just because you don't see an injury doesn't mean that the force that was used couldn't cause some type of injury, especially in the manner that it happened here where you had a fractured rib and then eventual, you know, documented shoulder injuries and loose teeth. Can I ask you a question on, let's just say hypothetically, one possibility is you, the district court judge has affirmed, you get to go to jury and you're making your damages argument. And in that setting you have both excessive force and deliberate indifference. Then the next hypothetical is all you have is excessive force but not deliberate indifference. Is your damages theory that? I'm just trying to figure out in my head how much this translates into a difference. I mean, I would assume you would say in excessive force claim you get all compensation for whatever the injuries are, right, which got worse with deliberate indifference would be your theory. But it doesn't matter, you don't have the claim, you still have excessive force. I'm just trying to figure out how much this makes a difference. You know, you're in front of a jury trial and you only have one. I'm having a hard time imagining you're saying, darn, we can't seek that extra $100,000. Is your question more can we make a double difference? How much of a difference does it make not to have the deliberate indifference claim in your damages theory? That is the question. Of course, you know, my crystal ball is not very good today with a jury. Obviously the jury, I don't know what they might do. Just answer the question. What is it about the damages for excessive force that would not capture what you would get for deliberate indifference? I can't figure out what it would be. I guess there probably wouldn't be. However, I think we certainly don't want to make a decision saying, well, because his damages are basically recouped in the excessive force, we'll just toss out the deliberate indifference claim. I think that creates bad jurisprudence in the future. That was not my suggestion. I was trying to figure out if you had an explanation why it mattered, and so far it doesn't seem to be. Yeah, I think you're right, Judge. The fact that he's injured because of the excessive force, I mean the teeth, the shoulders, the ribs, all that happens because of the excessive force. I think, yeah, that's arguably where if I was a juror, I would put the bulk of the compensation on that. So I guess if you just had that claim, it wouldn't make a difference. You can certainly imagine some back scenarios, right, where had the Officer Act asked right away, are you okay? And somebody said, no, I'm harmed, and there's a difference in getting medical care on day one versus day three. Just, I think, from the facts of this case, Chief Judge Sutton's question is revealing that it might not be as big of a difference in the facts of this case. Right, and he did ask medical right away, the nursing staff, and then within, I think, on the 20th, two days later, he was in the hospital. And I see my time is, I'm at seven seconds, but if the Court doesn't have any other questions. Shoot the shot before the time runs out. So we're good. Please affirm. Thank you, judges. All right, well, here's some rebuttal, Henderson. Thank you. I will focus on the deliberate indifference standard. I think we've covered the first topic thoroughly. And I think the panel has touched on and highlighted two of the main issues that we have with the lower court's ruling on the second issue, which is, first, when we look at the subjective prong. I'll start there. Essentially, he is asking for a ruling that any time significant force is used, an officer checked to ensure that medically that person is okay, even where there are no visible signs, there's no ask. And I think that is why there is a subjective prong to this, because there has to be actual knowledge on the part of the corrections officer that they ignore. And where there are no signs of that, such a rule seems not only impractical, but illogical. So setting aside the Eighth Amendment, why doesn't the prison itself or the jail have a policy suggesting if you use significant force, it's a good idea to ask the person whose force has been used on if they're okay. It might have been negligent for him not to. I recognize it's a high standard for the Eighth Amendment. But it seems like good practice. I don't know why we... I'm not a jail administrator, so I'm not sure why that policy isn't in place. But I am familiar with jails in general, and they do typically have a policy... I might suggest a slight variation on the policy. I think it's a great idea to check. I think it's asking a little bit much of someone who seemed to have been expressing some anger to have them sincerely say, I don't even know if it sounds sincere. I think the right idea is, so-and-so, would you mind checking on Erickson? I roughed him up. Let's just make sure he's okay. I love this question, but I don't think it's realistic that the person who just did the takedown is going to say, how did that feel? Are we advancing the ball? Because if he says, I'm fine, I'm not sure I like what's going to happen next. So I want this question from someone else. I agree, Your Honor, and I think even in those situations, it may then give some evidence of maliciousness if we were to hear that come out of someone's mouth. How did that feel? But in regards to... I'm sorry. I think, jail policy aside, I think what's difficult on the deliberate indifference question is we clearly do have some cases where the maneuver or the use of force is so intense that we would expect some sort of check or call for medical care if someone is shot, right, or if you can visibly see something. You would also assume some cases where maybe you can't see. Maybe there's a fleeing suspect there, and I know that's not the Eighth Amendment, but you hit someone with a car, right, and maybe they're not visibly injured, but you've struck them with the force of a moving vehicle, right, and maybe in some of those situations. And I think it's hard, and maybe this is why you're in clearly established land or something like that, but this is arguably a material question of fact of how much force is used here, right, and is this a moving car force? Maybe not. But at what point do we think an officer knows that there's a substantial risk of harm that they've caused because they've just done something very, very forceful? Well, I think there's two responses to that, and the first is the subjective prong based on what the officer is seeing and hearing and responding to, and I think that does capture the circumstances right then and there. But I think that also there's the objective prong of has the plaintiff demonstrated objectively serious injury, and that's where it also asks, in this case where really what's being alleged here is a delay in treatment because it's not an obvious injury, right, and when there's not an obvious injury, you do need some medical evidence that there was harm caused by not getting a delay. There's no such evidence here. The evidence is only that the same treatment was recommended as would have been recommended immediately, just rest, take some pain medication if you need it, such that we're not dealing with a situation where we have that car accident. The subjective prong is a timing question, not a question about the actual medical need? It is when it's not... Like here he has a broken rib. Yeah, it is when it's not an obvious injury. The case law says if it's not an obvious injury, something like a broken rib, because even this broken rib is one that can happen on its own, is the doctor's testimony, or it can happen from force. So where it's not something that's obvious on the outside, like I think the court has recognized kidney failure, you need some type of medical evidence demonstrating that the delay in getting the treatment and not recognizing it actually caused harm. That is part of the Eighth Amendment standard. How does... The doctor said a rib can break itself on its own? It is something that can happen, yes. Yes. I think it's from movement or something, not just spontaneously reversed. Other uses of force. It doesn't require a large use of force. Yes. Thank you, it's been a pleasure. Thanks to both of you for your helpful briefs and for answering our questions, which we always appreciate. Thank you very much.